IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | | |
|---|---|---|
| **BRAKE PARTS, INC.,**<br>a Delaware Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| vs. | ) | |
| | ) | Hon. _____ |
| **DAVID LEWIS,** | ) | |
| an individual, | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Brake Parts, Inc. ("BPI") brings this Complaint for Injunctive and Other Relief

against Defendant David Lewis ("Lewis"), and for its causes of action, states as follows:

### NATURE OF ACTION

1.      This is an action for threatened and actual misappropriation of trade secrets,

breach of contract, and breach of fiduciary duty and duty of loyalty.

2.      Despite reasonable efforts to protect BPI's proprietary and confidential

information, BPI now brings this action because it appears that a former BPI employee, Lewis,

retained, subsequent to his termination, confidential information related to BPI's production of

brake materials and used, and continues to use, this information to improperly compete in the

marketplace for his own benefit and the benefit of BPI's competitors.  The use of this

information provides Lewis, as well as any competitor to which Lewis divulged this information,

a head start and unfair position in the marketplace that neither would have without access to

BPI's confidential and proprietary information.

## PARTIES AND JURISDICTION

3.      Plaintiff Brake Parts, Inc. is a Delaware corporation with its principal place of business in McHenry, Illinois. It is a subsidiary of Affinia Group, Inc., a privately held company incorporated in Delaware, with its principal place of business in Ann Arbor, Michigan.

4.      Defendant Lewis is an individual domiciled at 220 Plantations Drive, Winchester, Kentucky. Lewis was employed by Echlin Corporation and through a series of transactions ultimately became employed by Brake Parts, Inc. at its Winchester, Kentucky facility from at least 1998 until 2008, when he was terminated for cause. While employed by BPI, he held the position of Principal Development Engineer.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction of this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000, excluding interest and costs.

6.      This Court has personal jurisdiction over Lewis and venue is proper in this District under 28 U.S.C. § 1391 because Lewis breached duties owed to BPI in this District, committed tortious acts in this District, performed contracts substantially connected to this District, traveled to this district, resides in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## BACKGROUND

### The History of BPI and Raybestos® Brake Products.

7.      BPI designs and manufactures braking products for passenger cars, light trucks, heavy truck and bus, and off highway applications. Its brake pad products include disc brake pads, such as professional and service grade disc brake pads, and police patrol disc brake pads.

2

BPI also provides brake shoes, rotors, drums, calipers, wheel cylinders, master cylinders, hoses and cables, and disc brake hardware axle kits.

8.    Because brakes are one of the most vital systems to the safety of a vehicle, BPI invests heavily in its research and development of the entire brake system.

9.    Through continuous research and development, BPI has set the benchmark for innovative and high quality brakes.

10.    BPI sells its products under the brand name Raybestos®.  Since 1902, Raybestos® brand brakes have been an industry leader, priding themselves on innovation, quality and safety.

11.    Raybestos® brand products have been utilized for over a hundred years in numerous vehicles, including the Model "T", World War II tanks and trucks, and throughout the auto racing industry.

12.    The Raybestos® brand became part of the Affinia Group, Inc. in 2004, after it acquired BPI from Dana Corporation.

13.    Previously, in 1998, Dana Corporation had acquired the Raybestos® brand from Echlin, Inc.

14.    As a result of the several acquisitions to create BPI, and to ensure the high-quality expected from the Raybestos® brand, BPI undertook extraordinary efforts to standardize the production of its brake products, creating standard specifications at one central location in the Winchester Research and Development Center, and then providing those specifications, through highly controlled and limited methods, to specific individuals at each BPI plant.

15.    Through this standardization, BPI could manufacturer any one of its high-quality brake pads, made to meet specific needs, including: (1) Advanced Technology Disc Brake Pads,

3

(2) Professional Grade Disc Brake Pads; (3) Service Grade Disc Brake Pads; and (4) Advance Technology Police Patrol Disc Brake Pads.

16.     Within these families of products, product engineers work on different formulations and processes for specific types of vehicles, *e.g.*, light passenger vehicles.

17.     Brake pads are steel backing plates with friction material bound to the surface facing the brake disk. Brake pad materials range from organic to semi-metallic formulations. Each of these materials provides advantages and disadvantages regarding environmental friendliness, wear, noise and stopping capability.

18.     For examples, while semi-metallic pads provide strength and conduct heat away from rotors, they also generate noise and create greater abrasiveness, resulting in increased rotor wear.

19.     Thus, BPI expends great energy and resources in the creation of the appropriate formulation and  mixture of elements and materials, through which BPI can manipulate and create the appropriate friction coefficient for the various grades of brake pads.

20.     Another key aspect of the brake pad is the process used to manufacture the brake pad, involving different levels of pressure, heat and time.

21.     The formulas, processes, bill of materials, standard operating procedures, and methods utilized to create the brake pads are proprietary and they are only available to select BPI employees.

22.     BPI provides multiple levels of security to ensure that the formulas, processes, bill of materials, standard operating procedures, and methods utilized to create the brake pads remain proprietary and they are only available to select BPI employees.

23.     The documents, such as log books and test results, are stored in a secure, central location, where access is limited only to those involved in the developmental efforts.  The

4

facility where these documents are stored requires both keyed access as well as entry of a security code. During non-business hours, the security system monitors which employee enters the facility by tracking the code entered into the system. The lobby and front-entrance of the facility are monitored by closed-captioned television. A non-BPI person may gain access to the facility only by signing into a log, and through identification through visual inspection by the BPI employee expecting the visitor.

24.    As an extra measure of security to maintain the secrecy and confidentiality of these materials, BPI uses various code names and numbers so that, *e.g.*, the person handling the bulk materials only can identify those materials by a code, rather than gaining knowledge of the precise quantity and quality of the material being ordered. These codes are maintained and secured at the Winchester Facility.

25.    Only an extremely limited control group of individuals gained access to the meaning of these codes, including Lewis.

26.    BPI further protects its information by requiring its personnel to sign agreements containing confidentiality covenants; limiting access to confidential information; utilizing computer passwords; limiting access to offices and documents; monitoring who is given access to confidential information; instructing personnel not to show any confidential information to clients or others outside BPI; and requiring all confidential and proprietary materials to be used for company purposes only.

27.    BPI's proprietary information is not generally known in the industry and is valuable because BPI derives economic value from the information not being publicly available.

28.    BPI's proprietary business and technical information is of great value to BPI and such information would give any competitor who improperly acquired such information a head start on development and an unfair competitive advantage.

CHI 11664370.1

## Lewis' History and Obligations

29.     Lewis began working for Echlin Corporation in January 1992.

30.     On January 15, 1996, Lewis entered into an "Invention and Disclosure

Agreement" ("IDA"), attached hereto as Exhibit A.

31.     The IDA requires Lewis, throughout his employment, to:

> treat as trade-secrets, hold in strongest confidence and not disclose directly
> or indirectly to any person, film or corporation, without express
> authorization of the Corporation [BPI], during or subsequent to their
> employment by it, any information or data which the employee may
> acquire or which may come to their knowledge or attention with respect to
> any invention, design, manufacturing technique, process, system, formula,
> improvement, development or experimental work, work in process, or any
> other private or confidential matter relating to the products, or business of
> the corporation, its predecessors or successors in business, affiliates and
> subsidiaries, unless and until the same shall have been published and made
> available to the public.

32.     Lewis' IDA requires that all materials relating to the operations, investigations

and business are the property of BPI and must be surrendered upon termination of employment.

33.     The IDA requires Lewis to also promptly disclose and assign any and all

inventions, discoveries and designs to BPI.

34.     The IDA explicitly recognizes that failure to abide by the terms of this agreement

will result in irreparable injury and entitles BPI to injunctive relief.

35.     In 1999, Lewis entered into a similar restrictive agreement with BPI, attached

hereto as Exhibit B.

36.     During the course of his employment, Lewis was entrusted with BPI's

confidential and proprietary information. This information included, among other things: (1)

technical data, (2) formulae, (3) logbooks for previous generations of brake parts, (4) bill of

materials, (5) test results performed on BPI brake parts, (6) margins, (7) vendor costs, (8) the

6

identity of vendors, (9) pricing strategies, (10) product information, (11) new product development, and (12) product road maps.

37.     This information was only entrusted to Lewis because of his explicit agreement to hold all such information in complete confidence and only use it for the benefit of BPI.

38.     During his career with BPI, Lewis worked on the development and improvement of ceramic (non-ferrous) brake pads for passenger vehicles, creating various iterations of disc-pad friction formulation.

39.     Thus, from the late 1990's until his termination, Lewis worked on creating a more cost-efficient brake pad, while simultaneously creating a "dust suppressed" (cleaner) and "quiet performance" (quieter) product.

40.     Throughout his career with BPI and its predecessors, however, Lewis received several documented complaints for his behavior in the workplace, including uncontrolled outbursts, threats of violence and ethnic and racial slurs.

41.     In January 2008, this behavior resulted in the immediate discharge and termination of Lewis.

### The Development of the 312 and Successor Generation Brake Pads

42.     As part of his duties as a Principal Development Engineer at BPI, Lewis assisted in the design and formulation of brake pads.

43.     In or around early 2003, BPI developed what was identified as the "312" generation of brake pads. At the time, it was a market leader and provided consumers a quiet performance and dust-suppressed option through the use of specific formulation and processes to create a non-ferrous brake pad.

7

44.     In addition to meeting consumer needs regarding dust and noise, through its relationship with AC Delco, BPI was also required to meet certain high-quality tests to ensure high-end performance of their products.

45.     Over the next five years, to meet these needs, BPI developed four successive generations of brake pads, culminating in the production of the "753" generation, which stood apart from any other similar product on the market.

46.     Lewis was significantly involved in the development of the "312" pads and each successive generation, including the "753".

47.     The evolution from the "312" through the "753" involved not only the four additional generations, but also tens of iterations between each generation in an effort to solve the needs of both consumers and AC Delco.

48.     Perhaps the single most important need was a brake pad that could operate on a wide variety of operating foundations, or platforms.

49.     Traditionally, brake pads had been created for a narrow range of platforms.  For example, a brake pad would be manufactured to fit the "Taurus" line of vehicles, but would work less satisfactorily for the "Tahoe" line.

50.     BPI, through manipulation and evolution of both its formulas and processes, created the "753" brake pad, which allowed for a predictable and stable friction coefficient, thus allowing it to be utilized on a wider range of platforms.

51.     In addition, BPI reduced several steps in its processes, and the manner in which the brake pads were manufactured, making the manufacture of these brake pads more efficient and cost effective.

8

52.    Because of these efforts, a product similar to the "753" could not be reproduced without years of development and/or access to BPI's proprietary information, logbooks, processes, formulas, testing, product history, know-how and experience.

53.    Shortly after the development of the "753", Lewis was terminated.

### A Brake Pad Identical to the "753" Appears on the Market

54.    After Lewis was terminated from BPI, he began consulting with various companies.

55.    Upon information and belief, Lewis provided consulting services to a rival of BPI known as Roulunds Braking, Inc., a subsidiary of MAT Holdings, Inc., located in Denmark.. Roulunds is also a joint venture partner of BPI in a project to develop brake pads.

56.    Upon information and belief, within months of his termination, Lewis was flown to the Danish headquarters of Roulunds for a meeting.

57.    Shortly thereafter, Roulunds entered into a distribution agreement with AutoZone to provide a brake pad known as AutoZone C-Max.

58.    In an effort to remain apprised of the efforts of its competitors, BPI performs certain tests on new brake pads to determine the types of materials being used, as well as the proportion that such materials are used.

59.    Using a brake dynamometer, BPI initially performed a brake effectiveness test.

60.    The results of a dynamometer test on the performance of a particular brake pad provide a type of "fingerprint" for the specific brake pad, identifying the friction stability at different pressures, speeds and temperatures.

61.    BPI performed the dynamometer effectiveness test upon the C-Max, and compared the results to the same controlled test performed on the 753 generation of brake pad.

62.    The comparison showed nearly identical "fingerprint" results.

9

63.     BPI also performed a test on the AutoZone C-Max, known as a PIXE, or Proton-induced X-ray Emission test.  In essence, this test bombards the brake product with protons, causing an x-ray emission, which then allows a technician to review the mass concentrations of specific elements present within the product.

64.     The results of this test demonstrated that the person formulating the C-Max had adjusted non-essential percentages of specific elements, but the overall balance of elements were designed to create performance nearly identical to that of the "753".

65.     Prior to the introduction of the C-Max, Roulunds had not offered a brake pad even comparable, let alone nearly identical, to the 753 generation created, and owned, by BPI.

66.     Indeed, no other product on the market has performance characteristics similar to the BPI "753" generation.

67.     Thus, despite express employment agreements, common law and statutory law, between Lewis and BPI, as well as his underlying obligations of good faith to BPI, Lewis, upon information and belief, provided proprietary information to at least one direct competitor, Roulunds, who is offering a product nearly identical to the "753" in the marketplace.

68.     In light of the fact that Lewis' confidentiality obligations remain in full force, it is difficult to imagine how a product never before offered by Roulunds, and which took over five years and five generations of testing, modeling and trial and error to create, was created out of thin air by Roulunds.

69.     Lewis' actions are a serious threat to BPI's business and are in violation of contractual obligations and applicable law.  BPI has no adequate remedy at law.

### Lewis' Other Bad Acts

70.     On information and belief, BPI has learned that Lewis is traveling the globe utilizing or disclosing BPI's confidential and proprietary brake pad formulations.  Further, on

10

information and belief, Lewis teamed up with a Georgia based high temperature fiber supplier to the brake industry to shop BPI's formulations along with the vendor's fiber for use in manufacturing brake pads utilizing BPI's formulations.

71.     On information and belief, Lewis has traveled to Europe, Canada and South America and has apparently met with friction material manufacturers improperly utilizing or disclosing BPI's formulations, techniques and processes. Further, on information and belief, Lewis is falsely holding himself out as the sole creator of formulations upon which 60 million sets of brakes have been sold by BPI or Affinia.

**COUNT I**
**BREACH OF CONTRACT**

72.     BPI hereby repeats, realleges and incorporates by reference the allegations contained in paragraph 1 through 71.

73.     Lewis's Invention and Disclosure Agreements are valid and enforceable contracts. The post-employment activity covenants, including the confidentiality covenants, are reasonable in scope and duration and are reasonably necessary to protect legitimate protectable interests in BPI's technical and developmental information.

74.     BPI has fully performed all of its obligations under the Agreements.

75.     Lewis has breached his agreement in at least one of the following ways:

    a. Removing confidential and proprietary information from BPI;

    b. Providing confidential and proprietary information to others outside of BPI;

    c. Utilizing or disclosing BPI's confidential and proprietary information for a purpose other than for the benefit of BPI; or

    d. Adversely interfering with the business of BPI.

76.     These actions have caused damage to BPI in the form of decreased sales, as well as the loss of the investment in years of product testing and development.

11

**WHEREFORE**, BPI prays for the following relief:

a. That BPI be awarded the cost and expenses related to the lost investment in the development of the "753" brake pad;

b. That BPI be awarded compensatory damages in an amount to be proven at trial in excess of $75,000;

c. That BPI be awarded punitive and/or exemplary damages for willful and malicious conduct;

d. That BPI be awarded attorneys' fees and the costs of this action as permitted by law;

e. That Lewis disgorge any monies obtained as a result of the improper actions alleged herein;

f. That Lewis be enjoined from utilizing or disclosing the proprietary and confidential information removed from BPI;

g. That Lewis identify all third parties to whom he revealed BPI's confidential and proprietary information; and

h. That BPI be awarded such other and further relief as the Court deems just and equitable.

**COUNT II**
**ACTUAL AND THREATENED MISAPPROPRIATION OF**
**TRADE SECRETS AND CONFIDENTIAL INFORMATION**

77.     BPI hereby repeats, realleges and incorporates by reference the allegations contained in paragraph 1 through 71.

78.     The proprietary business and technical information of BPI constitutes a trade secret under Kentucky law because BPI derives independent economic value from the development, formulation and production of its brake pads, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

79.     Lewis has actually misappropriated and/or threatens to inevitably misappropriate BPI's trade secrets without BPI's consent in violation of the Kentucky Uniform Trade Secrets Act ("KUTSA").  KRS § 365.880 *et seq.*

80.     Lewis knew or had reason to know that information supplied to him, created by him while a BPI employee, acted upon by him or forming the basis of his activities was utilized, removed improperly or derived from persons having a duty to maintain the secrecy of such information.

81.     Lewis has been and/or will be unjustly enriched by the misappropriation of BPI's trade secrets and/or confidential information, and will continue to threaten to use, actually use, divulge, acquire and/or otherwise misappropriate BPI's trade secrets and confidential information.

82.     Lewis' misappropriation has been wilful and malicious.

83.     As a result of the misappropriation of BPI's trade secrets, BPI has been injured and/or Lewis has been individually, or in concert with others, unjustly enriched.

**WHEREFORE**, BPI prays for the following relief:

a.   That BPI be awarded the cost and expenses related to the lost investment in the development of the "753" brake pad;

b.   That BPI be awarded compensatory damages in an amount to be proven at trial in excess of $75,000;

c.   That BPI be awarded punitive and/or exemplary damages for willful and malicious conduct;

d.   That BPI be awarded attorneys' fees and the costs of this action as permitted by law;

e.   That Lewis disgorge any monies obtained as a result of the improper actions alleged herein;

f.   That Lewis be enjoined from utilizing or disclosing the proprietary and confidential information removed from BPI;

13

    g. That Lewis identify all third parties to whom he revealed BPI's confidential and proprietary information; and

    h. That BPI be awarded such other and further relief as the Court deems just and equitable.

**COUNT III**
**BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY**

84.    BPI hereby repeats, realleges and incorporates by reference the allegations contained in paragraph 1 through 71.

85.    During his employment with BPI, Lewis was in a position of trust and had access to confidential information.

86.    Because of this position, Lewis had an obligation to act primarily for the benefit of BPI in matters involving the information and business of BPI.

87.    Although Lewis was free to compete using his personal experiences, he cannot utilize prior fiducial confidences to profit at the expense of BPI.

88.    Lewis therefore breached his fiduciary duty to BPI by utilizing information, including technical data, testing and formulae at the expense of BPI.

89.    BPI has been damaged by Lewis' willful breaches of his fiduciary duties and/or duty of loyalty to BPI.

    **WHEREFORE**, BPI prays for the following relief:

    a. That BPI be awarded the cost and expenses related to the lost investment in the development of the "753" brake pad;

    b. That BPI be awarded compensatory damages in an amount to be proven at trial in excess of $75,000;

    c. That BPI be awarded punitive and/or exemplary damages for willful and malicious conduct;

    d. That BPI be awarded attorneys' fees and the costs of this action as permitted by law;

14

e.  That Lewis disgorge any monies obtained as a result of the improper actions alleged herein;

f.  That Lewis be enjoined from utilizing or disclosing the proprietary and confidential information removed from BPI;

g.  That Lewis identify all third parties to whom he revealed BPI's confidential and proprietary information; and

h.  That BPI be awarded such other and further relief as the Court deems just and equitable.

Respectfully submitted,

BRAKE PARTS, INC.

By: _____

Barry D. Hunter
Frost Brown Todd LLC
250 West Main Street, Suite 2700
Lexington, Kentucky 40507
BHunter@fbtlaw.com
Tel.:   (859) 231-0000
Fax:   (859) 231-0011

*(Attorney for Defendant* Michael D. Wexler (Pro Hac Admission Pending)

Jason P. Stiehl (Pro Hac Admission Pending)

SEYFARTH SHAW LLP
131 S. Dearborn St., Ste. 2400
Chicago, Illinois 60603
(312) 460-5000

15